UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAUREN GOHL, as Next Friend of J.G.,

        Plaintiff,

                                         Case No. 12-cv-15199

v.

                                         HON. MARK A. GOLDSMITH

LIVONIA PUBLIC SCHOOLS, et al.,

        Defendants.

_____/

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS AND/OR FOR SUMMARY JUDGMENT (Dkts. 123, 127, 177, 179, 184, 190, 192)

### I.  INTRODUCTION

       In this civil rights case, Plaintiff Lauren Gohl, as next friend of her son J.G., alleges that Defendants violated J.G.'s rights under the Fourth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and under state law.  This matter is before the Court on Defendants' motions to dismiss and/or for summary judgment.[1]  The issues have been fully briefed and oral argument was held on each motion.

       For the reasons explained fully below, the Court finds that Defendants are entitled to summary judgment on Plaintiff's federal claims and, therefore, dismisses those claims with prejudice.  Because the dismissal of these federal claims means that this case no longer retains a

---

[1] There are 12 Defendants named in this action, each of whom has filed a motion to dismiss and/or for summary judgment: Cynthia DeMan (Dkt. 123); Sharon Turbiak (Dkt. 127); Randy Liepa, Elizabeth Santer, and Candy Sokol (Dkt. 177); Livonia Public Schools (Dkt. 179); Shellie Moore (Dkt. 184); Nancy Respondek (Dkt. 190); Tracey Crews, Carol DeBeaudry, Diane Sloboda, and Megan Sprow (Dkt. 192).

federal character, the Court dismisses Plaintiff's state-law claims without prejudice and denies those portions of Defendants' motions challenging the state-law claims without prejudice.

## II. BACKGROUND

During the 2011-2012 school year, Livonia Public Schools ("LPS") operated the Moderately Cognitive Impairment Program ("MoCI program") on behalf of the Wayne County Regional Educational Service Agency. The purpose of the MoCI program was to provide educational and therapeutic services to Wayne County special-education students between preschool and age 26.[2] The MoCI program for preschool students was operated by Webster Elementary School ("Webster"). Defendant Sharon Turbiak was the special-education teacher assigned to the Webster MoCI program during this school year. Turbiak was assisted by Defendant Nancy Respondek, a paraprofessional assigned to Turbiak's classroom.[3]

During that school year, J.G. was a three-year-old student in the Webster MoCI program. According to the complaint, J.G. was born with hydrocephalus and, as a result of numerous brain surgeries, had a ventricular peritoneal brain shunt implanted in his head behind his right ear to drain excess cerebrospinal fluid from his brain into his stomach. Second Am. Compl. ¶ 18 (Dkt. 78); Gohl Dep. at 127, 266-267 (Dkt. 127-2). According to Plaintiff Lauren Gohl, J.G.'s mother, J.G. had a new shunt implanted to replace his old one in June 2011. See Gohl Dep. at 277-278 (Dkt. 129-9). As of February 2014, J.G. has had no further surgeries and, when asked what his "current status" was regarding the shunt, Gohl responded that "everything looks good." Id. at 278.

---

[2] Students participating in this program have been diagnosed with a moderate cognitive impairment, meaning that they have an intelligence quotient ("IQ") of 55 or below. See Santer Dep. at 51-52, 167 (Dkt. 179-8).

[3] As a paraprofessional, Respondek assisted Turbiak "with classroom activities and lessons, as well as other various daily activities." Def. Respondek Mot. at 1 (Dkt. 190).

On October 24, 2011, Defendant Shellie Moore, the principal at Webster, was approached by Defendant Elizabeth Santer, the MoCI program specialist, who expressed concerns that some staff members had shared with Santer regarding Turbiak's classroom behavior. See Moore Dep. at 94-95, 99 (Dkt. 184-4). Following this interaction, Moore spoke with other staff members, including Defendants Tracey Crews, Megan Sprow, Candy Sokol, and Carol DeBeaudry. Id. at 646-649. Moore then compiled the information she had received from each staff member into a timeline of alleged events. See Moore Timeline (Dkt. 129-11).

The timeline indicates that staff members told Moore about Turbiak being "harsh with children, holding their faces or chins tightly and yelling in their faces," using "too much force [when] pushing on children's shoulders" while putting them in time-out, and treating children "roughly in the [classroom]." Id. at 2 (cm/ecf page). One staff member described Turbiak's treatment of the students as "gruff and abrupt," noting one incident in which Turbiak force-fed a student cereal and the student was gagging and crying. Id. This same staff member also noted that Turbiak would lift students off "the floor by one arm and that there was the potential to dislocate a small shoulder." Id. Moore believes that she provided a copy of this timeline to Defendant Cynthia DeMan, the director of personnel for LPS, on November 1, 2011. Moore Dep. at 130-132.

A few days after her meeting with Santer, Moore contacted DeMan regarding these issues and sought advice on how to handle the matter. DeMan Dep. at 81 (Dkt. 123-5). During this conversation, Moore informed DeMan that "a few staff members . . . had come to [Moore] and continued to say that Sharon Turbiak's classroom was loud and that Sharon was being rude and that Sharon was intimidating [the adult staff members]." Id. at 82.

3

On November 2, 2011, DeMan met with Turbiak, along with Turbiak's union representative and Dorothy Chomicz, a co-director of human resources for LPS.  See DeMan Dep. at 172-173.  According to DeMan, this conversation focused mainly on the interactions between Turbiak and other staff members.  Id. at 173.  At the end of this meeting, DeMan and Chomicz sent Turbiak home for a couple of days.  Id.

DeMan also wrote a memorandum to Turbiak, dated November 4, 2011, regarding appropriate behavior in the classroom and staff interactions.  Id.; 11/4/2011 DeMan Memo (Dkt. 123-8).  That memorandum stated that DeMan was "concerned about some of the interactions [Turbiak had] had with ancillary staff and [her] interactions with [her] students."  11/4/2011 DeMan Memo at 2 (cm/ecf page).  DeMan acknowledged that Turbiak was "forthright when [she] described the classroom behaviors of [her] students, [her] interactions with them and their families and with the support staff."  Id.  In recognizing that teaching may be frustrating and exhausting, DeMan wrote that "there is never an excuse for any teacher, especially an experienced teacher as [Turbiak], to lapse into inappropriate behaviors with either staff or students."  Id.  To remedy this situation, DeMan expected Turbiak to, among other things, "[m]aintain professional behaviors with students and with staff," and "[u]tilize [her] consult time opportunities to discuss best practices that will be acceptable for the well being of the student, and then put those into place."  Id.

Following the November meeting with Turbiak, some four months passed without any further reported incidents.  Then, on March 5, 2012, Defendant Diane Sloboda, an LPS social worker providing professional services to the MoCI program classroom, gave Moore a verbal and written report of an incident that Sloboda witnessed that day involving Turbiak and J.G.  According to her report, Sloboda entered the classroom to look for the LPS psychologist.  See

Sloboda Report at 2 (cm/ecf page) (Dkt. 123-9).  Sloboda then observed Turbiak "grab" J.G. "by the top of his head and jerk it back quite aggressively" before yelling, in close proximity to his face, "you need to listen."  Id.  Sloboda noted that a paraprofessional was present in the room when this incident occurred, but Sloboda did not know whether that paraprofessional witnessed the event.  Id.

After receiving Sloboda's report, Moore called either Chomicz or DeMan to report the incident and was instructed to "[s]end [Turbiak] over."  DeMan Dep. at 185-186.  DeMan and Chomicz then met with Turbiak and Turbiak's union representative later that afternoon.  See id. at 190-191.  According to DeMan, Turbiak denied the allegations of grabbing J.G.'s head and yelling in his face.  Id. at 193.  Rather, Turbiak informed DeMan that she put her hand on the back of J.G.'s head to keep it from bouncing around while redirecting his attention.  Id.  After hearing Turbiak's version of events, Chomicz sent Turbiak back to the classroom.  See id. at 198.

On April 2, 2012, DeMan and Chomicz met again with Turbiak.  DeMan prepared a memorandum reflecting the substance of the meeting.  See 4/23/2012 DeMan Memo (Dkt. 123-12).  In that memorandum, DeMan wrote that they had discussed the recent activity in Turbiak's classroom that had been reported to DeMan's office.  Id. at 2 (cm/ecf page).  DeMan further noted that "it appears that additional investigation will be necessary to determine if [Turbiak had] acted in accordance with [the guidelines addressed in the 11/4/2011 Memo] and whether [Turbiak had] engaged in other inappropriate actions or omissions."  Id.

DeMan then turned the matter over to Mark Schultz, the administrator of employee relations and public safety for LPS, as "an investigation involving a hostile work environment."  DeMan Dep. at 311, 328.  Schultz conducted an investigation and issued a report concerning Turbiak's alleged behavior, which included the March 5 incident involving J.G.  See 4/23/2012

Schultz Report at 23 (cm/ecf page) (Dkt. 129-19) (providing both Sloboda's and Turbiak's accounts of the March 5 incident).

On November 26, 2012, Lauren Gohl, as next friend of her son J.G., filed this lawsuit, alleging violations of the Fourth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and asserting state-law claims.

### III.  STANDARDS OF DECISION

In evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[c]ourts must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief." Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010) (brackets and citations omitted). To survive a motion to dismiss, a complaint must plead specific factual allegations, and not just legal conclusions, in support of each claim. Ashcroft v. Iqbal, 556 U.S. 662, 678-679 (2009). A complaint will be dismissed unless it states a "plausible claim for relief." Id. at 679.

Pursuant to Rule 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion,

> credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Thus, the facts and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Biegas v. Quickway Carriers, 573 F.3d 365, 373 (6th Cir. 2009) (brackets omitted).

When a defendant seeks summary judgment, the defendant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

6

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "To withstand summary judgment, the nonmoving party must present sufficient evidence to create a genuine issue of material fact." Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004). The nonmoving party "may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009). A mere scintilla of evidence is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 447 U.S. at 252.

## IV. ANALYSIS

### A. The Federal Statutory Claims

As a preliminary matter, the heading of count I in Plaintiff's second amended complaint appears to allege that each Defendant violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Second Am. Compl. at 5 ("Violation of the Americans with Disabilities Act – All Defendants"). However, the second amended complaint then identifies only Defendant LPS as having "violated those provisions of the [ADA] by its acts or omissions." Id. ¶ 27. Count II, however, which concerns alleged violations of the Rehabilitation Act ("RA"), 29 U.S.C. § 701 et seq., does not suffer from the same equivocality, as Plaintiff clearly states that "Defendants, each [and] every one of them, have violated [J.G.'s] rights under [the RA.]" Second Am. Compl. ¶ 33. Despite the apparent ambiguity in the pleading, the Court will examine Plaintiff's ADA claim as if it were alleged against each Defendant, and not just LPS.

### 1. Individual-Capacity Liability Under the ADA and RA

Plaintiff's second amended complaint does not specify whether the ADA or RA claims are against Defendants in their individual capacities, their official capacities, or both. Defendants argue that they cannot be held liable in their individual capacities for alleged violations of either the ADA or the RA. See Def. DeMan Br. at 13 (Dkt. 123); Def. Turbiak Br. at 12-13 (Dkt. 127); Defs. Liepa, Sokol, & Santer Br. at 11-12 (Dkt. 177); Def. Moore Br. at 22 (Dkt. 184); Def. Respondek Br. at 12 (Dkt. 190); Defs. Crews, DeBeaudry, Sloboda, & Sprow Br. at 12-13 (Dkt. 192). The Court agrees with Defendants.

The Sixth Circuit has repeatedly held "that the ADA does not permit public employees or supervisors to be sued in their individual capacities." Williams v. McLemore, 247 F. App'x 1, 8 (6th Cir. 2007); see also Lee v. Mich. Parole Bd., 104 F. App'x 490, 493 (6th Cir. 2004) (holding that "neither the ADA nor the RA impose liability upon individuals"); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 808 n.1 (6th Cir. 1999) (affirming dismissal of individual-capacity claim against superintendent, holding that "[i]ndividual supervisors who do not independently qualify under the statutory definition of employers may not be held personally liable in ADA cases").

Plaintiff contends that Defendants are liable in their individual capacities "[u]nder the plain language of the legislature." See Pl. Resp. to Turbiak Mot. at 15 (Dkt. 135). However, Plaintiff fails to provide any authority in support of this conclusory statement. Nor does Plaintiff offer any cogent argument that would authorize a departure from binding Sixth Circuit authority. Therefore, the Court finds that Plaintiff cannot sue Defendants DeMan, Turbiak, Liepa, Santer, Sokol, Moore, Respondek, Crews, DeBeaudry, Sloboda, and Sprow in their individual capacities for alleged violations of either the ADA or RA, and dismisses these claims with prejudice.

## 2. Redundancy of Official-Capacity Claims

8

Defendants further argue that any official-capacity claims should also be dismissed because LPS, the municipal entity and their employer, is also named as a defendant in this litigation.  See Def. Turbiak Br. at 13; Defs. Liepa, Sokol, & Santer Br. at 12; Def. Respondek Br. at 13; Defs. Crews, DeBeaudry, Sloboda, & Sprow Br. at 14.  Plaintiff, on the other hand, contends that Defendants' authority on this issue is non-binding, and that the issue of redundancy is irrelevant.  See Pl. Resp. to Turbiak Mot. at 15.  Rather, Plaintiff claims that she is "entitled to present the jury with a full and complete picture of the events that occurred here and the claims that arise from those events."  Id.  According to Plaintiff, "[t]o eliminate a legally viable claim against any defendant because of alleged redundancy is to eliminate the jury's right to award [punitive] damages."  Id.  Plaintiff provides no authority in support of these arguments.[4]

In fact, official-capacity claims against individual municipal employees are routinely dismissed as being redundant when the municipal employer or entity is also named as a defendant.  Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages and injunctive or declaratory relief." (ellipsis omitted)); Soper v. Hoben, 195 F.3d 845, 856 (6th Cir. 1999) (same).  Because LPS – the municipal entity – is named as a defendant in this case, and because Plaintiff has asserted ADA and RA claims against LPS, claims against individual Defendants in their official capacities would be redundant and unnecessary.  Therefore, the Court dismisses the official-capacity claims against Defendants

---

[4] Plaintiff's failure to provide authority is understandable, because punitive damages are not available under either Title II of the ADA or § 504 of the RA.  See Johnson v. City of Saline, 151 F.3d 564, 573 (6th Cir. 1998); Moreno v. Consol. Rail Corp., 99 F.3d 782, 791 (6th Cir. 1996) (en banc).

DeMan, Turbiak, Liepa, Santer, Sokol, Moore, Respondek, Crews, DeBeaudry, Sloboda, and Sprow with prejudice.  The only remaining claims under the ADA and RA concern LPS.

### 3.   Claims Against LPS Under the ADA and the RA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To state a prima facie claim under the ADA, "a plaintiff must show that: (1) [he] has a disability; (2) [he] is otherwise qualified; and (3) [he] was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of [his] disability."  Anderson v. City of Blue Ash, __ F.3d __, 2015 WL 4774591, at *12 (6th Cir. Aug. 14, 2015).

Employing similar language as that found in the ADA, § 504 of the RA provides that a qualified individual with a disability shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794(a).  To state a prima facie claim under the RA, a plaintiff must satisfy the following four elements:

> (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity was receiving Federal financial assistance.

G.C. v. Owensboro Pub. Schs., 711 F.3d 623, 635 (6th Cir. 2013).

Because claims brought under Title II of the ADA and § 504 of the RA require proof of substantially similar elements, courts often treat the two in the same manner and analyze ADA and RA claims together.  See S.S. v. E. Ky. Univ., 532 F.3d 445, 452-453 (6th Cir. 2008)

(analyzing ADA and RA claims together, but recognizing that, unlike the ADA, the RA reaches only federally funded entities and is limited "to denials of benefits 'solely' by reason of disability").

Plaintiff's second amended complaint sets out her theories for liability under these statutes. She alleges that J.G. "is protected as a person with a disability and is entitled to protections under 20 U.S.C. § 1415 to bring a claim or cause of action under the provisions of the [ADA]," that LPS allegedly violated. Second Am. Compl. ¶¶ 25, 27. Plaintiff also alleges that J.G. was subjected to abuse that was not "inflicted upon children without disabilities, while attending a public school," which "violates the prohibition against discrimination solely on the basis of disability" under the RA. Id. ¶ 32. Plaintiff further claims that LPS "violated [J.G.'s] rights under § 504 [of the RA] and the regulations promulgated thereunder by denying [J.G.] the benefits of receiving full and equal access to the public education programs and activities therein." Id. ¶ 33.

In its motion for summary judgment, LPS argues, inter alia, that Plaintiff has failed to satisfy prima facie elements under both the ADA and the RA – that J.G. was excluded from an educational program, deprived of an educational benefit, or discriminated against under the program because of his disability. See Def. LPS Br. at 13. For the reasons explained below, the Court agrees with LPS.

### a. Excluded From Participation in, or Being Denied the Benefits of, the MoCI Program

In its motion for summary judgment, LPS argues that Plaintiff has failed to identify the specific programs or activities from which J.G. was excluded, or identify an educational benefit of which J.G. was denied. Def. LPS Br. at 13-14. According to LPS, the evidence in this case demonstrates that J.G. was provided "with educational and related services pursuant to his

11

[individualized education program ("IEP")], and that he made progress on his IEP goals and objectives." Id. at 14.[5]

In response, Plaintiff appears to argue that Turbiak's alleged physical and emotional abuse had the effect of excluding J.G. from participating in his special educational program, as well as denying him "the benefits of [his] special educational program." See Pl. Resp. to LPS Mot. at 18 (Dkt. 215). Plaintiff's argument is premised on opinions offered by two alleged experts – Dr. Gerald Shiener, a psychiatrist, and Dr. Sharon Hall, who has a Ph.D. in education and a history of working in special education. Relying on Dr. Shiener's report, Plaintiff claims that J.G. "suffered incessant abuse at Turbiak's hands as a result of the environment that she created in her classroom." Id. at 17-18. Plaintiff relies on Dr. Hall's report to argue that "the actions that occurred in Turbiak's classroom amounted to abuse, the atmosphere in the classroom was itself harmful to her students, and that atmosphere was one in which the students, including [J.G.], could not receive the benefits of their special education program." Id. at 18 (citing Hall Report (Dkt. 215-7)). According to Plaintiff, these two experts "each explain [that J.G.] was deprived of a meaningful and effective education as a result" of Turbiak's alleged abuse. Id. at 19-20.

_____

[5] An IEP finds its source in the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., which "was designed to give children with disabilities a free appropriate public education ["FAPE"] designed to meet their unique needs." Nack ex rel. Nack v. Orange City Sch. Dist., 454 F.3d 604, 608 (6th Cir. 2006). According to the Supreme Court, a FAPE "consists of educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 188-189 (1982); see also 20 U.S.C. § 1401(9). To accomplish this goal, a school district that receives federal funds under the IDEA is required to establish an IEP for each disabled child, which "must contain a specific [written] statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." Nack, 454 F.3d at 608-609; see also 20 U.S.C. § 1414(d).

In its reply, LPS states that Dr. Shiener's expert report is not sworn and, therefore, constitutes inadmissible hearsay, which may not be adduced to secure or oppose summary judgment.  Def. LPS Reply at 2-3 (Dkt. 234).  LPS further contends that Dr. Shiener does not offer an opinion on whether J.G. "was denied educational benefits/services solely due to his disability[.]"  Id. at 3 (emphasis omitted).  Regarding Dr. Hall's report, LPS argues that she did not provide any evidence supporting the claim that J.G. was denied the benefits of his educational program.  Id.  Moreover, LPS contends that Dr. Hall's opinion is "meaningless," because she failed "to conduct an individualized inquiry as to whether [J.G.'s] services or IEP goals were appropriate, whether he made progress, or whether he should have been given additional services or goals."  Id.

The Court agrees with LPS that Plaintiff has failed to establish a genuinely disputed issue of fact regarding educational exclusion or deprivation.  Plaintiff and her experts speak only in conclusory and over-generalized terms, without focusing on specific evidence pertaining to J.G. As a consequence, Plaintiff fails to show that there is a triable issue of fact that J.G. was excluded from any particular educational program or service, or that he was deprived of any educational benefit.

Theoretically, Plaintiff might have tried to demonstrate a question of fact on educational exclusion or deprivation by looking to evidence touching on whether J.G.'s specific IEP goals had been significantly frustrated.  Such an approach would be consistent with how courts analyze claims brought under the IDEA where denial of a FAPE is alleged – a claim that Plaintiff did not assert in this lawsuit.  See M.L. v. Fed. Way Sch. Dist., 394 F.3d 634, 650 (9th Cir. 2004) (stating that, "[u]nder the IDEA, a disabled child is guaranteed a FAPE . . . which provides educational benefit to the handicapped child.  If a teacher is deliberately indifferent to teasing of

13

a disabled child and the abuse is so severe that the child can derive no benefit from the services that he or she is offered by the school, the child has been denied a FAPE." (citations, brackets, and emphasis omitted)).  J.G.'s IEP goals provide some fairly specific benchmarks, such as improving work habits, developing feeding and eating skills, developing perceptual discrimination and conceptual skills, and demonstrating emerging language skills.  6/7/2011 IEP Progress Report at 2-3 (cm/ecf pages) (Dkt. 179-14).  However, Plaintiff points to no evidence that J.G. was blocked from meeting any one of those specific goals.

To the contrary, the record evidence confirms "progress" in meeting those goals.  See, e.g., 3/14/2012 IEP Report at 2 (Dkt. 179-13) (noting "progress on goals"); 11/30/2011 IEP Report at 2 (Dkt. 179-12) (same).  These reports recite concrete examples of this progress:

- "[J.G.] has made nice gains in imitation and will imitate or spontaneously produce one-two words in routine activities, especially songs.  In recent weeks, [J.G.'s] willingness to participate in structured activities has increased and he has been doing some great work matching objects to pictures and using a communication device with 2 choices."  11/4/2011 Progress Report at 2 (cm/ecf page) (Dkt. 127-10).

- "He is often then able to transition successfully to the music enhanced motor experiences, then to the interactive and musical circle activities.  His attention span for these highly engaging activities is gradually lengthening, so that he remains calm and is then able to work on fine motor and feeding skills with his peers."  11/30/2011 IEP Report at 3 (cm/ecf page).

- "When engaged and interested in an activity, [he] receptively identifies many age appropriate vocabulary items and matches objects to photos or pictures on a 4 square communication device."  Id.

- "His attention and verbal imitation increase when language is presented in songs." Id.

- "[His] behavior has improved tremendously."  1/27/2012 Progress Report at 3 (cm/ecf page) (Dkt. 127-10).

- "[J.G.] has grown leaps and bounds with his overall demeanor."  Id.

- "[J.G.] is showing us new skills on a daily basis."  Id.

- "[J.G.] has made wonderful progress this quarter!"  Id.

- "[J.G.] has improved in [the] areas of [sensory and behavioral needs] since the last IEP, but still has difficulty participating in the classroom unless the environment is [ ] manipulated to meet his needs."  3/14/2011 IEP Report at 3 (cm/ecf page).

- "His attention span for these highly engaging activities is gradually lengthening, so that he remains calm and is then able to work on fine motor and feeding skills with his peers."  Id.

- "When engaged and increased in an activity, [J.G.] receptively identifies many age appropriate vocabulary items and matches objects to photos or pictures on a 4 square communication device.  He seems interested in the device, looks carefully at all pictures, selects only the appropriate symbol for the item he wants or is labeling, and listens to the voice output."  Id.

To be sure, the reports reflect that J.G. remained a very challenged child.  E.g. 3/14/2012 IEP Report at 3 (cm/ecf page) ("significant delays in in Gross Motor, sensory skills, Language and Cognitive domains").  But the portrait that emerges is hardly one of a child who has been excluded from his educational program or deprived of educational benefits.  Apparently, the education team LPS assembled for J.G. – which included a teacher, paraprofessional, occupational therapist, physical therapist, and speech therapist, see Gohl Dep. at 410-411 (Dkt. 179-11) – produced positive educational results for this severely challenged three-year old student.

Plaintiff purports to find evidence of educational deprivation in the reports of Dr. Shiener and Dr. Hall.  But these reports are not sufficient to create an issue of fact to forestall summary judgment.

As a threshold issue, Dr. Shiener's report is procedurally defective, because, as an unsworn report, it is inadmissible hearsay, which the Court cannot consider for purposes of summary judgment.  Sigler v. Am. Honda Motor Co., 532 F.3d 469, 481 (6th Cir. 2008).  Furthermore, although Plaintiff referred generally to Dr. Shiener's report, she failed to provide a

citation to the report and failed to specify the pages on which she relied.  Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to <u>particular parts</u> of materials in the record[.]" (emphasis added)); <u>see also</u> <u>T&H Landscaping, LLC v. Colo. Structures Inc.</u>, No. 06-cv-00891-REB-MEH, 2007 WL 4224213, at *5 (D. Colo. Nov. 27, 2007) ("Global, generic citations to multiple-page exhibits . . . without specific pinpoint citations to guide the court's review are inadequate to support or withstand a summary judgment motion.").

As for its substance, the report says absolutely nothing about the deprivation of an educational benefit.  It notes that J.G. engages in "ritualistic behavior" – supposedly triggered by the March 5, 2012 incident – which takes the form of frequent hand washing and checking whether his mother puts on a seat belt when in a car.  <u>See</u> Shiener Report at 4 (cm/ecf page) (Dkt. 215-6).  But nothing in the report talks of J.G. being deprived of any educational benefit.[6]

Dr. Hall's report similarly misfires.  Procedurally, Plaintiff erred by simply attaching the report to her brief in response without any citation to particular pages in support of Plaintiff's arguments.  <u>See</u> Fed. R. Civ. P. 56(c)(1)(A); <u>see also</u> <u>T&H Landscaping, LLC</u>, 2007 WL 4224213, at *5.

---

[6] The report also speaks of unspecified "changes" to J.G.'s brain due to his alleged exposure to Turbiak's abuse of him and other students.  This opinion is unsupported – and insufficient for summary judgment purposes – because Dr. Shiener neither performed nor reviewed any medical procedures or tests that might have detected any brain "change."  Fed. R. Evid. 702, 703; <u>Dow v. Rheem Mfg. Co.</u>, Nos. 09-13697-BC, 10-10753-BC, 11-10647-BC, 2011 WL 4484001, at *9 (E.D. Mich. Sept. 26, 2011) ("[W]here, as here, the proffered expert has performed no reliable testing on his theory, courts, including the Sixth Circuit, have routinely precluded the witness from offering an expert opinion." (citing cases)).  In any event, even assuming that there were "changes" to J.G.'s brain, neither Plaintiff nor Dr. Shiener contend or substantiate that such "changes" led to educational deprivation.

Substantively, there are fatal deficiencies, as well. Based on Turbiak's alleged misbehavior, Dr. Hall simply opines in a global and conclusory fashion that none of the children in Turbiak's classroom received the education to which they were entitled. Hall Report at 5, 26.[7] But an expert's parroting of a bare legal conclusion is entitled to no consideration by a court. See, e.g., Williams v. Ford Motor Co., 187 F.3d 533, 543 (6th Cir. 1999) (stating that Rule 56 "requires that the nonmoving party set forth specific facts showing that there is a genuine issue for trial," and noting that "although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues." (brackets omitted)).

Dr. Hall's report fails for the additional reason that it does not address essential evidence that bears critically on the opinion she offers. While she recognizes that the "students' IEPs are central to" her opinion, Hall Report at 28, she never addresses any particular inadequacies of J.G.'s IEP, or the progress he made on his IEP goals. In fact, Dr. Hall never discusses the evidence of his progress at all, nor does she point to evidence tending to show that he was not making progress, or was otherwise regressing in his abilities.

An expert opinion that does not address the central facts at issue in a case is insufficient to defeat summary judgment. See Robinson v. Union Carbide Corp., 805 F. Supp. 514, 523 (E.D. Tenn. 1991) ("[E]ven when an expert's affidavit is admissible, it will not serve

---

[7] Although Dr. Hall opines that "[t]here is no reasonable basis to believe that any of the students in Sharon Turbiak's classroom during the 2011-2012 school year were receiving a [FAPE] as envisioned by IDEA, and Section 504 of the [RA]," Hall Report at 5, 26, Plaintiff never alleged in her complaint, nor ever asserted in her briefing, that J.G. was not receiving a FAPE. Any effort now by Plaintiff to introduce a new claim by way of a response to a summary judgment motion would not be appropriate. Tucker v. Union of Needletrades, Indus. & Textile Emps., 407 F.3d 784, 788 (6th Cir. 2005). In any case, this opinion suffers from the other defects noted infra; it is a bare legal conclusion that fails to address critical facts, and it fails to show what specific educational benefit J.G. was denied.

automatically to defeat a motion for summary judgment, if it is so 'minimal' that it could not by itself establish a necessary element of the plaintiff's case[.]"); Estate of Detwiler v. Offenbecher, 728 F. Supp. 103, 140 (S.D.N.Y. 1989) (recognizing that summary judgment is not appropriate "where the nonmoving party relies solely on an expert opinion that is not based upon specific facts, or that makes unsupported assumptions or ignores important facts").

By ignoring key facts, Dr. Hall's opinion simply amounts to one long conclusion that fails to set out a logical line of reasoning.  Without a sound line of reasoning – grounded in the facts of the case – the Hall report cannot assist Plaintiff in defeating summary judgment.  See R.C. Olmstead, Inc. v. CU Interface, LLC, 606 F.3d 262, 271 (6th Cir. 2010) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."); Brainard v. Am. Skandia Life. Assurance Corp., 432 F.3d 655, 663-664 (6th Cir. 2005) ("An expert opinion submitted in the context of a summary judgment motion must be more than a conclusory assertion about ultimate legal issues. . . .  [It] must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation.").

Ultimately, Dr. Hall's report fails for the same reason Dr. Schiener's report is defective: the failure to identify any specific program or benefit that J.G., in particular, was denied.  As Dr. Hall herself recognized, abusive behavior "may" lead to unfortunate learning outcomes.  See, e.g., Hall Report at 24 (when exposed to bullying, "[c]hildren may become unwilling to try new activities or learn new skills").  But Dr. Hall never opines that J.G. actually was unwilling to try new activities or learn new skills.

Plaintiff's theory comes down to the proposition that a plaintiff can make out a claim under the ADA or RA – without a showing of actual educational deprivation – simply by showing a teacher's abusive classroom conduct.  Plaintiff has failed to provide any legal

authority in support of such a proposition.  Nor does the Court's own research reveal a case holding that, for purposes of an ADA or RA claim, a teacher's alleged physical and emotional abuse, without a demonstrable impact on the alleged victim's education, constitutes exclusion from an educational program or denial of an educational benefit.

Therefore, the Court finds that Plaintiff has failed to present sufficient evidence to create a genuine issue of material fact that J.G. was excluded from participating in any particular educational program, or that J.G. was denied any particular benefit of an educational program. To the extent Plaintiff grounds her ADA and RA claims in exclusion from an educational program or deprivation of an educational benefit, the Court grants LPS's motion for summary judgment on these claims.

### b.  Subject to Discrimination

Another basis for an ADA or RA claim is discriminatory treatment.  To prove discrimination under the ADA or RA, a disabled plaintiff must demonstrate that he or she was treated differently than a similarly situated, non-disabled student.  See, e.g., Parker v. Metro. Life Ins. Co., 121 F.3d 1006, 1019 (6th Cir. 1997) (en banc) ("The ADA simply does not mandate equality between individuals with different disabilities.  Rather, the ADA, like the Rehabilitation Act, prohibits discrimination between the disabled and the non-disabled."); S.S., 532 F.3d at 456 (affirming the district court's grant of summary judgment of the plaintiff's ADA and RA claims, where the district court concluded that purported disparate treatment did not support a finding of discrimination).

This differential-treatment requirement was squarely addressed in the district court's grant of summary judgment on ADA and RA discrimination claims in Horen v. Board of Education of the City of Toledo Public School District, 948 F. Supp. 2d 793 (N.D. Ohio 2013),

aff'd, No. 13-3775 (6th Cir. Feb. 7, 2014) (unpublished).  In that case, parents brought an action on behalf of their disabled child, alleging that the defendants, including the school district, discriminated against their child in violation of the ADA and the RA.  Id. at 808.  The court noted that, for a prima facie case of discrimination, the plaintiffs bore the burden of showing that the school district treated a similarly situated student differently than their disabled daughter.  Id. at 815.  Because the plaintiffs "failed to point to any similarly situated pupil whom [the school district] treated differently than it treated [their daughter]," the court held that the plaintiffs could not satisfy a prima facie case of discrimination under the ADA or RA, and granted the defendants summary judgment on those claims.  Id.

In this case, Plaintiff's second amended complaint alleges that J.G. was discriminated against solely because of his disability.  Second Am. Compl. ¶ 32.  This allegation is predicated on Turbiak's alleged physical and emotional abuse, and other co-Defendants' failure to report that abuse.  See id.  LPS argues that it is entitled to summary judgment because Plaintiff has failed to provide any record evidence that J.G. was treated differently than a similarly situated, non-disabled student.  Def. LPS Br. at 15.  The Court agrees with LPS.

Plaintiff's briefing does not address LPS's discrimination argument concerning the lack of evidence of a similarly situated, non-disabled student, and, therefore, the Court may consider this fact undisputed.  Fed. R. Civ. P. 56(e)(2); Rugiero v. Nationstar Mortg., LLC, 580 F. App'x 376, 378 (6th Cir. 2014) (stating that, "if a party fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion" (brackets and ellipsis omitted)); see also Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary

judgment fails to address the argument in any way."). Although Plaintiff did not address this issue in her briefing, during the hearing on DeMan's motion for summary judgment, Plaintiff argued that Turbiak discriminated against J.G. because she must have, at some point in time, interacted with non-disabled children and no complaints of child abuse have surfaced. However, this "[u]nsubstantiated speculation is not enough to create a genuine issue of material fact." Nelski v.Trans Union, LLC, 86 F. App'x 840, 846 (6th Cir. 2004). Consequently, Plaintiff has pointed to no evidence indicating that a similarly situated, non-disabled student was treated differently than J.G.

Accordingly, to the extent Plaintiff's ADA and RA claims are grounded in discriminatory treatment, LPS is awarded summary judgment on those claims.

### c. Causation

Even if Plaintiff had established a triable issue of fact that J.G. was excluded from participating in, was denied the benefit of, or was subjected to discrimination under, a specific educational program or activity, Plaintiff would still have to establish a causal connection between J.G.'s disability and Defendants' actions toward J.G. For her ADA claim, Plaintiff must show that the actions were "because of" J.G.'s disability. Anderson, 2015 WL 4774591, at *12. For her RA claim, Plaintiff must show that the actions were "solely by reason of" J.G.'s disability. G.C., 711 F.3d at 635.

Despite earlier pronouncements from the Sixth Circuit that the "sole-cause" standard of the RA applied equally to ADA claims, see, e.g., Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312, 314-315 (6th Cir. 2012) (citing cases), the Sixth Circuit has clarified that the sole-cause standard does not apply to ADA claims. Id. at 317 (holding that the sole-cause standard does not apply to Title I ADA claims); Anderson, 2015 WL 4774591, at *12 n.1 (holding that the

sole-cause standard does not apply to Title II ADA claims). Rather, for a Title II ADA claim, Plaintiff "must show that the defendant took action <u>because of</u> the plaintiff's disability, <u>i.e.</u>, the plaintiff must present evidence that <u>animus</u> against the protected group was a <u>significant factor</u>[.]" <u>Anderson</u>, 2015 WL 4774591, at *12 (emphasis added).

In its motion for summary judgment, LPS argues that there is no evidence establishing that Defendants' actions were taken because of J.G.'s disability. Def. LPS Br. at 14. In support of its argument, LPS argues that Turbiak's action on March 5, 2012 in moving J.G.'s head was meant "to redirect his attention" after he had thrown a toy. <u>Id.</u> at 15. LPS also argues that certain Defendants' failure to report alleged child abuse was "because they did not believe a call was warranted," not because of J.G.'s disability. <u>Id.</u>[8]

In response, Plaintiff contends that the record evidence "demonstrates that [J.G.] was abused because of his disability." Pl. Resp. to LPS Mot. at 18. In support of this argument, Plaintiff relies on the Moore timeline, stating that Moore met with Turbiak, and Turbiak talked about how she felt "stressed out because of the level of disability of her students[.]" <u>Id.</u> at 18. Although there is no specific citation, Plaintiff also quotes the following language from the timeline: "Ms. Turbiak appeared more harsh and abrupt with the lower-functioning students." <u>Id.</u> Plaintiff also refers to a letter DeMan wrote to Turbiak in November 2011, which apparently stated that DeMan "believe[d] [Turbiak's] work in [the MoCI] program is not only difficult, but can be frustrating and at times possibly overwhelming." <u>Id.</u> at 19 (quoting 11/4/2011 Letter (Dkt. 215-18)). Without any citations, Plaintiff then provides various examples of Turbiak

---

[8] Aside from stating that "[v]arious employees of LPS knew that [Turbiak hated the MoCI program students] and failed to do anything," Pl. Resp. to LPS Mot. at 19, Plaintiff failed to address LPS's argument that Defendants' failure to report alleged child abuse was not because of J.G.'s disability. Def. LPS Br. at 14. As such, the Court concludes that this fact is undisputed. Fed. R. Civ. P. 56(e)(2).

allegedly targeting her abuse based on the student's particular disability, which she argues illustrates that "Turbiak hated these students for their disabilities and punished them as a result." Id.

In its reply, LPS argues that Plaintiff has failed to offer any evidence that there was a pattern of abuse concerning J.G. Def. LPS Reply at 2. LPS also states that Plaintiff's assertion that J.G. was abused because of his disability is speculative and lacks record citations. Id. at 3-4.

Regardless of which causation standard the Court employs, under the ADA or the RA, there is no evidence that Turbiak's alleged abuse on March 5, 2012 was "because of" or "solely by reason of" J.G.'s disability. As a threshold matter, Plaintiff's failure to cite to the record for the alleged abuse inflicted on other students because of their disabilities permits this Court to disregard those alleged incidents. Fed. R. Civ. P. 56(c)(1)(A); Coleman v. Blue Cross Blue Shield of Kansas, Inc., 287 F. App'x 631, 635 (10th Cir. 2008) (it is not the responsibility of the district court "to conduct a fishing expedition of plaintiff's . . . record evidence in order to support the assertions made in her response"). But even ignoring that defect in Plaintiff's response, her theory is, at most, that Turbiak took certain actions against other disabled students based on their particular disabilities. How alleged misconduct directed toward other students can substantiate disability-animus against J.G. is never explained. Nor does Plaintiff provide any legal authority validating the use of such evidence in opposition to summary judgment for an ADA or RA claim.

Moreover, the various portions of the Moore timeline and the DeMan letter, upon which Plaintiff relies, fail to substantiate Plaintiff's contention that Turbiak allegedly abused J.G. on March 5, 2012 because of his disability. The full sentence from the October 2011 timeline reads as follows: "[Turbiak] talked about feeling unappreciated at Webster, of not having a role

23

anymore and that she was stressed out because of the level of disability of her students and the reduction of support." Moore Timeline at 3 (cm/ecf page). Notably, the statement indicates that Turbiak's stress was related to several reasons, only one of which was the level of disability of her students. The statement is also notable for what it does <u>not</u> say: it does not say that she took any action because of the disability of her students, or that she took any action against J.G. at all. Plaintiff simply cannot create an issue of fact that disability animus against J.G. was a "significant factor" for Turbiak's alleged misconduct on the basis of a thoroughly opaque statement made in late October 2011 – some four months before the March 2012 incident. Furthermore, the portion of the timeline that suggests Turbiak targeted lower-functioning students does not indicate that J.G. was one of those students. Plaintiff has failed to provide any evidence to suggest the contrary.

Lastly, the November 2011 letter DeMan sent Turbiak does not create a genuine issue of material fact that Turbiak's March 2012 conduct was because of J.G.'s disability. The letter merely states that <u>DeMan</u> believed that Turbiak's work was "difficult," "frustrating," and "possibly overwhelming." 11/4/2011 Letter at 2 (cm/ecf page) (Dkt. 215-18). A statement from the director of personnel for LPS in the fall of 2011 that Turbiak's work was challenging is not evidence that Turbiak abused J.G. in March 2012 because of J.G.'s disability, or that animus was a significant factor in that alleged abuse.

Accordingly, LPS is entitled to summary judgment on Plaintiff's claims under the ADA and RA, for the additional reason that Plaintiff cannot meet the causation standards under those statutes.[9]

---

[9] LPS also argues that Plaintiff's failure to exhaust her administrative remedies under the IDEA bars Plaintiff's claims under the ADA and RA. <u>See</u> Def. LPS Br. at 12 (Dkt. 179). LPS further argues that it is entitled to summary judgment because Plaintiff has failed to allege either bad

### B.  The Federal Constitutional Claims

To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a person acting under the color of state law deprived the plaintiff of a constitutional right.  West v. Atkins, 487 U.S. 42, 48 (1988); Harris v. City of Circleville, 583 F.3d 356, 364 (6th Cir. 2009) (same). Government officials are generally shielded from civil liability when performing discretionary functions, unless their conduct violates a clearly established constitutional right such that every reasonable official would have known that his or her conduct was unlawful.  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011).  Once a defendant raises qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to such immunity.  Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013).

In opposing a defendant's claim of qualified immunity, the plaintiff must show the following: (i) the defendant violated a constitutional right based on the facts alleged, and (ii) the right was clearly established.  Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014) (citing Saucier v. Katz, 533 U.S. 194, 200 (2001)).  If the plaintiff is unable to establish the violation of a constitutional right, the court's inquiry ends and the defendant is entitled to immunity.  Perez v. Oakland Cnty., 466 F.3d 416, 426-427 (6th Cir. 2006), cert. denied, 552 U.S. 823 (2007).

In this case, Plaintiff alleges that Turbiak's alleged conduct constitutes excessive force in violation of the Fourth and Fourteenth Amendments.  See Second Am. Compl. ¶¶ 35-39. Plaintiff also appears to allege that each Defendant violated J.G.'s rights under the Equal Protection Clause of the Fourteenth Amendment.  See id. ¶¶ 45-48.  Defendants argue that they are entitled to qualified immunity.  The Court will consider each constitutional claim in turn.

---

faith or gross misjudgment on behalf of any Defendant in this case.  Id. at 15-16.  As the Court has concluded that Plaintiff's ADA and RA claims fail for other reasons, the Court declines to address these additional arguments.

### 1.  The Excessive-Force Claim

Plaintiff alleges that, on March 5, 2012, Turbiak grabbed J.G. by the top of his head, aggressively jerked it backwards, and yelled very close to his face.  As Turbiak describes the incident, after J.G. had knocked a ring-stacking toy off a table, she placed her left hand behind J.G.'s head and her right hand on his chin to redirect his attention and to prevent J.G. from thrusting his head in a backwards motion.  It is Plaintiff's contention that Turbiak's conduct constituted excessive force in violation of both the Fourth and Fourteenth Amendments.  <u>See</u> Second Am. Compl. ¶¶ 35-39.

### a.  Fourth Amendment

The Fourth Amendment (applicable to state actors through the Fourteenth Amendment) protects individuals against "unreasonable searches and seizures."  U.S. Const. amend. IV. Plaintiff argues that Turbiak's excessive force constituted an unreasonable "seizure" in violation of the Fourth Amendment.  <u>See</u> Pl. Resp. to Turbiak Mot. at 20 (Dkt. 135).  According to Plaintiff, a public school teacher is a representative of the state, and when such an individual momentarily uses excessive force against a student, that force amounts to a seizure under the Fourth Amendment.  <u>Id.</u> at 21 (citing <u>New Jersey v. T.L.O.</u>, 469 U.S. 325 (1985)).

When faced with the same argument, the Sixth Circuit has repeatedly held that a student's claim of excessive force by a teacher is properly analyzed under the Due Process Clause of the Fourteenth Amendment, rather than under the Fourth Amendment.  <u>See, e.g.</u>, <u>Lillard v. Shelby Cnty. Bd. of Educ.</u>, 76 F.3d 716, 724-725 (6th Cir. 1996) (holding that the plaintiffs' claims that their teacher slapped one and sexually harassed two others did not fall into the category of claims alleging a "right to be free from unreasonable seizures under the Fourth Amendment," but, rather, their claims were "premised on the alleged violation of a

26

constitutionally protected liberty interest, within the meaning of the Fourteenth Amendment, in their personal bodily integrity," and applying the shocks-the-conscience standard of substantive due process); Nolan v. Memphis City Schs., 589 F.3d 257, 269 (6th Cir. 2009) (applying the shocks-the-conscience standard to student's excessive-force claim); Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006) (same); Webb v. McCullough, 828 F.2d 1151, 1158-1159 (6th Cir. 1987) (same).

Therefore, the Court dismisses Plaintiff's Fourth Amendment claim and will analyze Plaintiff's excessive-force claim under the substantive due process standards of the Fourteenth Amendment.

### b.    Fourteenth Amendment

The Fourteenth Amendment provides that a state may not deprive an individual "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. As the Sixth Circuit has recognized, "it is well established that persons have a fourteenth amendment liberty interest in freedom from bodily injury." Doe v. Claiborne Cnty., 103 F.3d 495, 508 (6th Cir. 1996) (brackets omitted). This amendment endeavors to protect an individual's substantive due process rights by barring "certain government actions regardless of the fairness of the procedures used to implement them." Lillard, 76 F.3d at 724. The liberty interest in freedom from bodily injury triggers the test for substantive due process, which, in turn, requires the Court to examine "whether the conduct complained of 'shocks the conscience' of the [C]ourt." Id. The Sixth Circuit has explained that, under the "shocks the conscience" standard,

> [a] substantive due process claim is quite different than a claim of assault and battery under state tort law. Substantive due process is concerned with violations of personal rights of privacy and bodily security. The substantive due process inquiry must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather

> than a merely careless or unwise excess of zeal that it amounted to
> a brutal and inhumane abuse of official power literally shocking to
> the conscience.

Id. at 725 (brackets and ellipses omitted).

In viewing the evidence in the light most favorable to J.G. – that Turbiak aggressively jerked J.G.'s head backwards and yelled in his face – the Court finds that Turbiak's conduct did not violate J.G.'s substantive due process rights.  This single act of abuse simply does not rise to the level of conscience-shocking behavior.  See, e.g., Lillard, 76 F.3d at 726 ("[I]t is simply inconceivable that a single slap could shock the conscience. . . .  While we do not mean to suggest that school systems should tolerate a teacher who slaps a student in anger, neither do we conclude that one slap, even if made for no legitimate purpose, rises to the level of a constitutional violation."); Minnis ex rel. Doe v. Sumner Cnty. Bd. of Educ., 804 F. Supp. 2d 641, 652 (M.D. Tenn. 2011) (holding that "the teacher's acts of grabbing the child's face and shaking his head on one occasion, and grabbing his arm on another occasion hard enough to cause bruising, simply do not rise to the level of a 'conscience-shocking,' brutal and inhumane abuse of authority," even though the child was three-and-a-half-years old, mentally disabled, and diagnosed as having an autism-spectrum disorder); C.A. ex rel. G.A. v. Morgan Cnty. Bd. of Educ., 577 F. Supp. 2d 886, 890-894 (E.D. Ky. 2008) (holding that the substantive due process rights of a twelve-year-old student with an I.Q. of 42 were not violated, where the principal paddled the child's bottom at least three times); Griffin v. Sanders, No. 11-CV-12289, 2013 WL 3788826, at *16 (E.D. Mich. July 19, 2013) (holding that the substantive due process rights of a mentally disabled student with the mental capacity of a two-year old were not violated, where her teacher struck her once); Fessler v. Giles Cnty. Bd. of Educ., No. 1-00-0120, 2005 WL 1868793, at *1, 16 (M.D. Tenn. July 27, 2005) (holding that the substantive due process rights of

28

an eight-year-old autistic student were not violated, where a teacher's aide kicked him and threw him to the ground, because he did not suffer a severe injury).[10]

Nor is there any evidence from which a reasonable jury could find that J.G. sustained any physical injury, much less a severe physical injury, as a result of Turbiak's conduct on March 5, 2012. For instance, Plaintiff has failed to present any medical evidence that J.G. suffered any physical injury. As stated supra at note 6, Dr. Shiener did not review or perform any medical procedures regarding J.G.'s brain. His report, however, does contain an oblique and conclusory reference to brain injury by stating that "[t]he kind of behaviors described would have an extremely negative effect and damaging effect on brain tissue." Shiener Report at 6 (cm/ecf page) (Dkt. 215-6). The "kind of behaviors described" was characterized by Dr. Shiener as "grabbing [J.G.'s] head, shaking his head, jerking his head, and twisting his head." Id. However, there is no evidence that Turbiak shook or twisted J.G.'s head. Even if this reference

---

[10] Plaintiff's attempt to aggrandize the physical abuse to which J.G. was subjected, beyond the March 5 incident, is without merit. For example, Plaintiff claims that Turbiak's statement to Moore that she (Turbiak) would no longer put her hands on J.G. raises an inference that she had improperly used her hands before. Pl. Resp. to LPS Mot. at 17. But the premise of this purported inference is wrenched out of context: as a child who suffered from a loss of muscle control, J.G. required body management by his teachers and aides. See Respondek Dep. at 407-409 (Dkt. 235-9); Gohl Dep. at 355-356 (Dkt. 235-11); Moore Dep. at 284-285 (Dkt. 235-4). In context, Turbiak's statement obviously reflects a determination by her that she should avoid any contact because it might be misconstrued, just as the March 5 incident was, at least from her perspective. In any case, even if it amounts to an admission that Turbiak had previously touched J.G. in an inappropriate manner, it is not an admission that there were frequent or severe episodes.

Plaintiff further argues that Turbiak allowed a student with mobility issues to fall to the floor, and that J.G. had mobility issues. Pl. Resp to LPS Mot. at 3, 17. However, neither assertion is accompanied by any citation to record evidence. And, in any event, allowing a child to fall onto a padded floor while the child is learning to walk – which is apparently what happened in this incident – is hardly abusive. See Moore Timeline at 2 (cm/ecf page) (Dkt. 179-21) (Moore "checked with the physical therapist about" Turbiak letting children fall to the floor, and noted that such behavior "would be appropriate as the floor [was] deeply padded and that when teaching them the transition, falling is common[.]").

could be viewed as an opinion that J.G. suffered brain damage, an expert's opinion that is not based on the facts of the case is entitled to no consideration.  Zuzula v. ABB Power T & D Co., Inc., 267 F. Supp. 2d 703, 711 (E.D. Mich. 2003) (Rule 702 requires that an expert's opinion must "be based on a foundation grounded in the actual facts of the case . . . and that the expert appropriately 'fits' the facts of the case into the theories and methods he or she espouses" (citing Daubert v. Merrell Dow Pharm., 509 U.S. 579, 591-593 (1993)).

There is also insufficient evidence from which a reasonable jury could find that Turbiak's alleged conduct created a serious risk of severe physical injury.  Despite Plaintiff's claim that "the record in this case demonstrates that any trauma to [J.G.'s] head was capable of causing death due to the shunt in his head," Pl. Resp. to Turbiak Mot. at 23; see also Second Am. Compl. ¶ 18, Plaintiff has failed to provide any evidence to support the contention that any severe head movement of an individual with a ventricular peritoneal brain shunt could be potentially life threatening in general, let alone to J.G. in particular.  In any case, the existence of a shunt itself would not necessarily give this alleged act of abuse a constitutional character.  See Honaker v. Beverage, No. 87-13, 1989 WL 517, at *11 (E.D. Ky. Jan. 4, 1989) (holding that there was no substantive due process violation where an autistic fifteen-year-old student with a shunt was slapped on both sides of his face with his teacher's forehand and backhand).

In addition to physical abuse, Plaintiff argues that J.G.'s presence in the classroom while Turbiak allegedly abused other students constituted emotional abuse that amounts to conscience-shocking behavior.  See Pl. Resp. to Turbiak Mot. at 23-24.  In particular, Plaintiff claims that J.G. sustained emotional abuse because he "witnessed several acts and patterns of abuse at the hands of Turbiak and Respondek," Pl. Resp. to LPS Mot. at 17, pointing to allegations that Turbiak confined a wheelchair-bound student in a bathroom, and placed tubes over the arms of

another student with auditory sensitivity and yelled at that student.  Id. at 19.  However, there are no record citations to substantiate the assertion that J.G. witnessed any of these alleged incidents.[11]

In fact, these particular alleged incidents either occurred in the afternoon session of the 2011-2012 MoCI classroom, or in the 2010-2011 school year; J.G. only attended the morning sessions during the 2011-2012 school year, and there is no evidence that he attended MoCI in an earlier school year.  See Gohl Dep. at 410, 413; Schultz Report at 5, 10, 11, 13; Sokol Dep. at 164, 228, 232, 244; Sprow Dep. at 38, 149-150, 219; Crews Dep. at 131-132, 154, 304; Attendance Records (Dkt. 235-10).  Therefore, J.G. could not have sustained any emotional abuse as a result of supposedly watching those alleged incidents.[12]

Moreover, for Turbiak's alleged emotional abuse to shock the conscience, it must have still caused severe injury to J.G.  Lillard, 76 F.3d at 725.  Although Plaintiff states that she "has the support of expert witnesses for the notion that the emotional abuse was physically harmful to [J.G.] as such abuse can permanently impact a child's brain," Pl. Resp. to Turbiak Mot. at 23 (emphasis omitted), Plaintiff has failed to provide any citation to any evidence that the alleged

---

[11] Plaintiff has also failed to provide any authority for the proposition that witnessing the abuse of another person could ever constitute excessive use of force against J.G. cognizable under the Constitution.

[12] Evidence in the record further contradicts Plaintiff's argument.  Dr. Shiener's report recounts that Lauren Gohl began noticing negative behavioral changes in J.G. in March 2012, see Shiener Report at 3 (cm/ecf page), which would significantly undercut Plaintiff's theory that Turbiak's abuse included not only the March 2012 incident, but also months of emotional abuse leading up to that incident.  Compare Pl. Resp. to LPS Mot. at 17-18 (arguing that Turbiak's alleged abuse was not limited to March 2012) with Shiener Report at 3 (cm/ecf page) ("The behavior and the situation in the classroom dated back to beginning of March 2012[.]") and Pl. Resp. to Turbiak Mot. at 11-12 (after removing J.G. from LPS, Plaintiff noticed that J.G. "began to exhibit anxiety and panic and, whenever he desired to get his mother's attention, he would grab her by the face just as Turbiak grabbed him by the face.").

emotional abuse in this case actually caused any injury to J.G., let alone severe injury.  Courts have repeatedly held that allegations of emotional injury, without some measure of physical injury, are insufficient for a substantive due process claim.  See, e.g., Mahone v. Ben Hill Cnty. Sch. Sys., 377 F. App'x 913, 916 (11th Cir. 2010) (although the plaintiff allegedly suffered from PTSD and other psychological injuries, he did not suffer any physical injury, and, therefore, his injuries did not rise to the level of severity to support a violation of substantive due process); Peterson v. Baker, 504 F.3d 1331, 1338 (11th Cir. 2007) ("[C]onstitutional violations do not arise unless the teacher inflicts serious physical injury upon the student."); Brown v. Lippard, 472 F.3d 384, 387 (5th Cir. 2006) ("This Circuit has found an injury insufficient to support an excessive force claim where there is no physical injury, or it is extremely minor (emphasis in original)); Christiansen v. City of Tulsa, 332 F.3d 1270, 1279 (10th Cir. 2003) (stating that the Tenth Circuit has "never upheld an excessive force claim without some evidence of physical injury").  As emphasized above, Plaintiff has failed to create an issue of fact regarding physical injury, and, therefore, her claim of emotional injury must also fail for this additional reason.

    To the extent that Plaintiff relies on Dr. Shiener's report[13] for the assertion that "experiencing and witnessing the acts of abuse causes damage to a child's brain," Pl. Resp. to Turbiak Mot. at 10 (emphasis added), the Court finds that such reliance is misplaced.  A careful review of the report clearly indicates that the "literature on trauma describes lasting changes in brain development, and accompanying behavioral changes in victims of emotional trauma," and, in Dr. Shiener's opinion, "[i]n this case, . . . such changes occurred."  Shiener Report at 6 (cm/ecf page) (Dkt. 215-6) (emphasis added).  However, Dr. Shiener never claims that J.G.

---

[13] As noted supra, Dr. Shiener's unsworn report is inadmissible hearsay, which the Court cannot consider for purposes of summary judgment.  Nevertheless, as explained infra, the Court finds that the report does not support Plaintiff's excessive-force claim premised on emotional abuse.

sustained any brain <u>damage</u> or <u>injury</u> as a result of the alleged emotional abuse.  Nor does Dr. Shiener provide any type of detailed explanation of the nature or degree of the alleged brain changes.  As emphasized earlier, conclusory opinions by an expert are not sufficient to defeat summary judgment.  <u>Williams v. Ford Motor Co.</u>, 187 F.3d 533, 543 (6th Cir. 1999).

Similarly, Plaintiff's reliance on Dr. Hall's report in support of her argument fails, as that report never states that J.G. himself sustained any type of injury, let alone severe injury, as a result of any alleged emotional abuse.  <u>See</u> Hall Report at 22 (simply opining that the "students in this classroom . . . were . . . negatively <u>impacted</u> by [Turbiak's] abusive and bullying atmosphere." (emphasis added)).  Nor did Dr. Hall state that J.G. was actually the victim of any emotional abuse himself, or that he was actually impacted negatively by the alleged abuse.  <u>See</u> <u>id.</u> at 24 ("[A] child who observes a classmate being bullied <u>may</u> disassociate or distance him/herself[.]" (emphasis added)); <u>id.</u> ("The observer <u>may</u> disassociate from the child who is the target of bullying[.]" (emphasis added)); <u>id.</u> ("The <u>children may</u> become compliant due to anxiety and fear." (emphasis added)); <u>id.</u> at 24-25 ("The <u>children may</u> become unwilling to try new activities or learn new skills[.]" (emphasis added)); <u>id.</u> at 25 ("The <u>students'</u> energies <u>may</u> be spent watching the bullying teacher's behavior[.]" (emphasis added)).  Hall never says that any of these untoward results actually were suffered by J.G. and fails to supply any supporting evidence of such particularized impact on him.

Accordingly, the Court concludes that Turbiak did not violate J.G.'s Fourteenth Amendment rights and is entitled to qualified immunity on Plaintiff's excessive-force claim. This result is in keeping with the Supreme Court's oft-repeated admonition: "[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state

actor into a constitutional violation." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 202 (1989).

### 2. The Equal-Protection Claim

The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination by the government that "'burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.'" Loesel v. City of Frankenmuth, 692 F.3d 452, 461 (6th Cir. 2012) (quoting Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 681-682 (6th Cir. 2011)); see also Davis v. Prison Health Servs., 679 F.3d 433, 438 (6th Cir. 2012) ("The Equal Protection Clause of the Fourteenth Amendment 'protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights.'" (quoting Scarbrough v. Morgan Cnty. Bd. of Educ., 470 F.3d 250, 260 (6th Cir. 2006))); Dixon v. Univ. of Toledo, 702 F.3d 269, 278 (6th Cir. 2012) ("Fundamentally, the [Equal Protection] Clause protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." (quotation marks omitted)).

Plaintiff does not contend that a fundamental right has been burdened. Nor does she claim that J.G. belonged to a suspect class. See S.S. v. E. Ky. Univ., 532 F.3d 445, 457 (6th Cir. 2008) ("Disabled persons are not a suspect class for purposes of an equal protection challenge."); see also Tennessee v. Lane, 541 U.S. 509, 522 (2004) (explaining that "classifications based on disability violate [the Equal Protection Clause] if they lack a rational relationship to a legitimate governmental purpose"). Therefore, the Court must determine if Defendants intentionally treated J.G., a disabled student, differently than similarly situated, non-disabled students, and, if so, whether Defendants' actions were rationally related to some legitimate governmental purpose. S.S., 532 F.3d at 457 (citing Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356,

34

366-368 (2001)); see also Robinson v. Jackson, __ F. App'x __, 2015 WL 3650196, at *4 (6th Cir. June 15, 2015) (stating that, to prevail on his equal protection claim, the plaintiff must demonstrate disparate treatment of similarly situated individuals, and that the disparate treatment was the result of intentional and purposeful discrimination).

The Sixth Circuit has repeatedly recognized that disparate treatment is a threshold requirement of an equal-protection violation. Marie v. Am. Red Cross, 771 F.3d 344, 361 (6th Cir. 2014) (citing Scarbrough, 470 F.3d at 260). The Supreme Court has also made it clear that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In opposing the present motions for summary judgment, Plaintiff bears the burden of demonstrating that Defendants intentionally treated J.G. differently than similarly situated individuals. S.S., 532 F.3d at 457-458 (6th Cir. 2008) (stating that the plaintiff had "the burden of showing that . . . [defendants] intentionally treated him differently — because he is disabled — than similarly situated students who were like him in all relevant respects").

The Court does not require "exact correlation" when evaluating whether parties are similarly situated but, rather, demands only "relevant similarity." Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir. 2000); see also Loesel, 692 F.3d at 462 (holding that the plaintiffs had "the burden of demonstrating that they were treated differently than other property owners who were similarly situated in all material respects" (emphasis in original)). Generally, the similarly situated determination is an issue of fact for the jury. Loesel, 692 F.3d at 463. However, a district court may grant summary judgment "where it is clear that no reasonable jury could find that the similarly situated requirement has been met." Fares Pawn, LLC v. Indiana Dep't of Fin. Insts., 755 F.3d 839, 846 (7th Cir. 2014). The Sixth Circuit does not hesitate to affirm a grant of

summary judgment where a plaintiff fails to identify other similarly situated individuals.  See, e.g., Dixon v. Univ. of Toledo, 702 F.3d 269, 279 (6th Cir. 2012); EJS Props., L.L.C. v. City of Toledo, 698 F.3d 845, 865-866 (6th Cir. 2012); Bench Billboard Co. v. City of Cincinnati, 675 F.3d 974, 987 (6th Cir. 2012).

Although Plaintiff alleges that J.G. was treated unfavorably, she has failed to present sufficient evidence to create a genuine issue of material fact that J.G. was treated differently than a similarly situated, non-disabled student.  See Bah v. Attorney Gen. of Tenn., 610 F. App'x 547, 555 (6th Cir. 2015) (recognizing that equal-protection claims are generally stated as "the plaintiff is similarly situated to another individual but the defendant treated the plaintiff disparately with no rational basis for doing so"); see also Wymer v. Richland Cnty. Children Servs., 584 F. App'x 283, 284 (6th Cir. 2014) ("To state [an equal protection claim], the [plaintiffs] must allege that the defendants treated a similarly situated person better than they treated the [plaintiffs]").

Plaintiff might have satisfied this element by showing that Turbiak disciplined a non-disabled student in a manner that did not involve any alleged physical or verbal abuse.  She has not done so.  As for the other Defendants, Plaintiff might have satisfied this element by showing that an allegation of child abuse arose involving a non-disabled student, and those Defendants acted in a manner different than in J.G.'s case (i.e., reporting the alleged abuse).  Again, Plaintiff has not done so.

Rather, Plaintiff merely alleges that Defendants violated the Equal Protection Clause, because their actions were "not inflicted upon young children in the LPS district who do not have disabilities."  Second Am. Compl. ¶ 46.  Without anything more, this unsubstantiated and conclusory assertion is insufficient for equal-protection purposes.  See Gallagher v. Pontiac Sch. Dist., 807 F.2d 75, 79 (6th Cir. 1986) ("Although [the plaintiff] states conclusively that he was

36

not treated in a similar fashion as others, he never explains how he was treated any differently from any similarly situated students."); Hall v. Callahan, 727 F.3d 450, 457 (6th Cir. 2013) ("In making an equal protection challenge, the plaintiff must demonstrate that a discrimination of some substance has occurred which has not occurred against other individuals who were similarly situated.").[14]

Regarding Turbiak in particular, Plaintiff contends that "[i]n all [her] time as an LPS employee, surely Turbiak interacted with non-disabled students." Pl. Resp. to Turbiak Mot. at 31 (Dkt. 135). Plaintiff further states that "[t]here is no evidence that Turbiak ever targeted such individuals with the physical and emotional abuse that she targeted [J.G.] and his classmates with." Id. However, as noted above, this "[u]nsubstantiated speculation is not enough to create a genuine issue of material fact." Nelski, 86 F. App'x at 846. Plaintiff's argument also fails to appreciate that it is Plaintiff's burden to demonstrate that Turbiak intentionally treated J.G. differently than similarly situated individuals. S.S., 532 F.3d at 457.

In viewing the evidence in the light most favorable to Plaintiff, no reasonable juror could conclude that J.G. was intentionally treated differently than a non-disabled student. Therefore, the Court finds that Defendants did not violate J.G.'s equal-protection rights, and concludes that Defendants are entitled to qualified immunity on this claim.

### 3.  The Municipal-Liability Claim

---

[14] Insofar as Plaintiff argues that certain Defendants, as supervisory municipal employees, violated the Equal Protection Clause by their deliberate indifference to Turbiak's discriminatory harassment toward J.G., see Pl. Resp. to DeMan Mot. at 27 (Dkt. 129) (citing Shively v. Green Local Sch. Dist. Bd. of Educ., 579 F. App'x 348 (6th Cir. 2014)), the claim fails because, without a constitutional violation by Turbiak, there can be no indifference by the supervisory personnel. Raspardo v. Carlone, 770 F.3d 97, 129 (2d Cir. 2014) ("Because we have held that there was no underlying constitutional violation, there is also no supervisory liability."); Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010) ("[T]o impose § 1983 liability the plaintiff first had to establish the supervisor's subordinates violated the Constitution." (brackets omitted)).

In order to pursue a claim for municipal liability under § 1983, a plaintiff must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); accord D'Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir. 2014).  A plaintiff may properly allege municipal liability by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of[,] or acquiescence to[,] federal rights violations." D'Ambrosio, 747 F.3d at 386 (brackets omitted).

Importantly, municipal liability for the actions of employees may not be based on a theory of respondeat superior; rather, "[m]unicipal liability only attaches where a custom, policy, or practice attributable to the municipality was the 'moving force' behind the violation of the plaintiff's constitutional rights." Heyerman v. Cnty. of Calhoun, 680 F.3d 642, 647-648 (6th Cir. 2012) (quoting Miller v. Sanilac Cnty., 606 F.3d 240, 254-255 (6th Cir. 2010)).  However, "if a plaintiff does not suffer a constitutional violation, there can be no unconstitutional custom or policy that is 'the moving force' behind an act upon which municipal liability can attach." Baker v. Smiscik, 49 F. Supp. 3d 489, 501 (E.D. Mich. 2014) (citing Heyerman, 680 F.3d at 648); accord Ryan v. City of Detroit, No. 11-CV-10900, 2015 WL 1345280, at *8 (E.D. Mich. Mar. 25, 2015) ("The failure of a plaintiff to demonstrate the violation of a constitutional right means that a Monell claim fails as a matter of law.").  A plaintiff "has the burden of proof for establishing the existence of an unconstitutional policy and demonstrating the link between the policy and the alleged injuries at issue." Bennett v. City of Eastpointe, 410 F.3d 810, 819 (6th Cir. 2005).

38

As discussed above, the Court concludes that J.G. did not suffer a constitutional violation of either his Fourth Amendment or Fourteenth Amendment rights. Accordingly, the Court grants LPS's motion with respect to any of the constitutional claims against it.[15]

### C. The State-Law Claims

Having determined that Plaintiff's federal claims lack merit, the case does not retain a federal character. Accordingly, pursuant to 28 U.S.C. § 1367, the Court declines to extend supplemental jurisdiction over Plaintiff's state-law claims, including any alleged failure to report child abuse, assault, battery, gross negligence, willful and wanton misconduct, and intentional infliction of emotional distress contained in counts VI through IX, and dismisses them without prejudice. Brown v. Cuyahoga Cnty., 517 F. App'x 431, 436 (6th Cir. 2013) ("28 U.S.C. § 1367 allows a district judge to decline to exercise supplemental jurisdiction over state-law claims if the district court has dismissed all claims over which it has original jurisdiction." (ellipsis omitted)).

### V. CONCLUSION

For the reasons stated above, the Court grants, in part, and denies, in part, Defendants' motions to dismiss and/or for summary judgment (Dkts. 123, 127, 177, 179, 184, 190, 192). The federal statutory and constitutional claims are dismissed with prejudice, and the state-law claims are dismissed without prejudice.

SO ORDERED.

Dated: September 30, 2015                    s/Mark A. Goldsmith
      Detroit, Michigan                    MARK A. GOLDSMITH
                                   United States District Judge

---

[15] Plaintiff's second amended complaint does not explicitly allege that LPS is municipally liable under § 1983 for violations of the Equal Protection Clause. To the extent that such a claim may be implied, the Court grants summary judgment in favor of LPS on this claim, as well, for the reasons stated above.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2015.

s/Carrie Haddon
Case Manager
